13-1658-cv
Dalberth, et al. v. Xerox Corporation, et al.

1    UNITED STATES COURT OF APPEALS
2    FOR THE SECOND CIRCUIT
3    _____
4
5    August Term, 2013
6
7    (Argued: March 14, 2014          Decided: September 8, 2014)
8
9    Docket No. 13-1658-cv
10
11    _____
12
13    THOMAS DALBERTH, on behalf of himself and all others similarly situated,
14    IBEW LOCAL 164 WELFARE FUND, on behalf of itself and all others similarly
15    situated, ROBERT W. ROTEN, on behalf of himself and all others similarly
16    situated, GEORGIA STANLEY, on behalf of herself and all others similarly
17    situated,
18
19                    *Plaintiffs - Appellants,*
20
21                    v.
22
23    XEROX CORPORATION, BARRY ROMERIL, PAUL A. ALLAIRE,
24    RICHARD THOMAN,
25
26                    *Defendants - Appellees.*[*]
27
28    _____
29

---

[*] The Clerk of Court is directed to amend the case caption as above.

1    Before: JACOBS, POOLER, *Circuit Judges*, and REISS, *District Judge*.[**]
2
3            Appeal from a judgment of the United States District Court for the District
4    of Connecticut (Alvin W. Thompson, *J.*) granting Defendants' motion for
5    summary judgment on Plaintiffs' claims alleging violations of Sections 10(b) and
6    20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and
7    Rule 10b-5, 17 C.F.R. § 240.10b-5. Because we conclude that Xerox and its
8    executive officers made sufficient disclosures regarding their worldwide
9    restructuring initiative and their U.S.-based Customer Business Organization
10   Reorganization, we affirm.

11                                    _____

12                          BRAD N. FRIEDMAN, Millberg LLP, New York, N.Y.,
13                          *Counsel for Plaintiff-Appellant IBEW Local 164 Welfare Fund*.
14
15                          Stanley D. Bernstein, Bernstein Leibhard LLP, New York,
16                          N.Y., *Class Counsel and Counsel for Plaintiff-Appellant Robert*
17                          *W. Roten*.
18
19                          Mark Levine, Stull, Stull & Brody, New York, N.Y., *Class*
20                          *Counsel and Counsel for Plaintiffs-Appellants Thomas*
21                          *Dalberth and Georgia Stanley*, on behalf of themselves and
22                          all others similarly situated.
23

_____

[**] The Honorable Christina Reiss, Chief Judge of the United States District
Court for the District of Vermont, sitting by designation.

1               SANDRA C. GOLDSTEIN, Cravath, Swaine & Moore
2               LLP, (J. Wesley Earnhardt, *on the brief*), New York, N.Y.,
3               *for Defendant-Appellee Xerox Corporation.*

5               Thomas D. Goldberg, Day Pitney LLP, Stamford, CT, *for*
6               *Defendant-Appellee G. Richard Thoman.*

8               John A. Valentine, Wilmer Cutler Pickering Hale and
9               Dorr LLP, Washington, D.C., *for Defendants-Appellees*
10              *Barry D. Romeril and Paul A. Allaire.*

12              Alfred U. Pavlis, Finn Dixon & Herling LLP, Stamford,
13              CT, *for Defendants-Appellees Barry D. Romeril and Paul A.*
14              *Allaire .*

15   POOLER, *Circuit Judge*:

16       Named Plaintiffs and class representatives Thomas Dalberth, Robert Roten,

17   Georgia Stanley, and the International Brotherhood of Electrical Workers Local

18   164 Welfare Fund (collectively, "Plaintiffs") appeal from an April 1, 2013

19   judgment and a March 29, 2013 ruling of the United States District Court for the

20   District of Connecticut (Alvin W. Thompson, *J.*), granting summary judgment in

21   favor of Xerox Corporation and executive officers Barry D. Romeril, Paul A.

22   Allaire, and G. Richard Thoman (collectively, "Xerox" or "Defendants"). *In re*

23   *Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448 (D. Conn. 2013) ("*Xerox*").

3

1    We consider here a situation where a corporation undertakes a large-scale,

2    worldwide restructuring initiative, which was itself comprised of multiple

3    smaller sub-initiatives, and address whether there is a genuine dispute of

4    material fact with respect to the sufficiency of the corporation's disclosures

5    regarding the progress of a single sub-initiative. Plaintiffs filed this class action in

6    1999 alleging that Xerox and executive officers Romeril, Allaire, and Thoman

7    violated federal securities law by materially misrepresenting that Xerox's

8    worldwide restructuring initiative was financially beneficial to the corporation,

9    when, in fact, one specific component of the restructuring—the "Customer

10   Business Organization Reorganization"—was causing significant and ongoing

11   economic distress to the company. Because we conclude that there is no genuine

12   dispute of material fact with respect to the sufficiency of Xerox's disclosures

13   about the successes and failures of this component of its worldwide

14   restructuring, we affirm the district court's grant of summary judgment in favor

15   of Defendants.

16                                    **BACKGROUND**

17   This is a class-action lawsuit brought on behalf of all persons who

18   purchased common stock from Xerox during the period from October 22, 1998

4

1    through October 7, 1999, alleging violations of the Securities Exchange Act of

2    1934 (the "Exchange Act"). Plaintiffs bring their claims under Sections 10(b) and

3    20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R.

4    § 240.10b-5, promulgated by the Securities and Exchange Commission ("SEC")

5    pursuant to Section 10(b) of the Exchange Act.

6         The actions giving rise to this lawsuit commenced as a result of Xerox

7    taking on several initiatives in 1998 and 1999, when Xerox was attempting to

8    make itself more competitive in the global market. During some or all of this

9    time, Romeril was Xerox's Chief Financial Officer ("CFO"); Allaire was Xerox's

10    Chief Executive Officer ("CEO"); and Thoman was Xerox's President and Chief

11    Operating Officer ("COO"). Thoman also served temporarily as CEO from 1999

12    to 2000. The three initiatives relevant to this lawsuit are:

13        1.    the Worldwide Restructuring ("WWR"), announced on April
14                 7, 1998, which included 150 specific projects and was intended
15                 to be fully implemented in 2001;
16        2.    the 1998 Customer Business Organization Reorganization
17                 ("CBO Reorganization"), which was one of the 150 WWR
18                 initiatives and was focused primarily on improving and
19                 centralizing the support to Xerox's U.S.-based sales force,
20                 known as the North American Solutions Group ("NASG");
21                 and
22        3.    the 1999 Sales Force Realignment ("1999 SFR"), announced on
23                 January 6, 1999, which was distinct from the WWR, and had a

1          goal of realigning sales force territories from geography-based
2          to industry-based selling.
3
4    As discussed in greater detail below, Plaintiffs contend that the problems that

5    arose from the CBO Reorganization—which involved the closure of one of

6    Xerox's four Customer Administrative Centers ("CACs") and the reorganization

7    of the three remaining centers into Customer Business Centers ("CBCs")—were

8    insufficiently disclosed to the market.

9          The district court's opinion sets out in commendable detail the factual

10   background in this case, with which we assume the parties' familiarity. *See Xerox*,

11   935 F. Supp. 2d at 451-83. We set forth below primarily facts which are pertinent

12   to the question of sufficient disclosure. This evidence is taken from the sizable

13   summary judgment record, and is undisputed unless otherwise noted.

14   I.    **The Worldwide Restructuring Program**

15         On April 7, 1998, Xerox announced the WWR, a company-wide

16   restructuring program that had the goal of enhancing its competitive position

17   and lowering costs overall. In Xerox's 1998 Form 10-K submission to the SEC,

18   Xerox identified and described the following three "[k]ey initiatives" of the

19   WWR:

1.  Consolidation of 56 European customer support centers into one facility and implementing a shared services organization for order entry, invoicing, and other back-office and sales operations.

2.  Streamlining manufacturing logistics, distribution and service operations. This will include centralizing U.S. parts depots and outsourcing storage and distribution.

3.  Overhauling our internal processes and associated resources, including closing one of four geographically-organized U.S. customer administrative centers with the remaining three refocused by customer segment, enabling improved customer support at lower cost. [(the "CBO Reorganization")]

App'x at 2756. The WWR also anticipated the elimination of an estimated 9,000 positions worldwide, to be accomplished through "voluntary reductions and layoffs." App'x at 390. Xerox estimated that once fully implemented, the pre-tax savings from the WWR would amount to approximately $1 billion annually.

The CBO Reorganization, listed as the third "key initiative" above, involved the elimination of approximately 550 positions, and was anticipated to cost about $30 million to implement and ultimately produce $45 million in annual savings. It primarily involved the closure of one of Xerox's four CACs, and the reorganization of the three remaining CACs into CBCs, located in Illinois, Texas, and Florida. As part of the CBO Reorganization, Xerox transferred the order entry function originally performed by Customer Business Representatives

1   ("CBRs") in its regional sales offices around the U.S. to the three CBCs.

2   Employees at the CBCs required substantial training in order to take on these

3   shifted responsibilities.

4        On October 22, 1998, Xerox issued a release reporting strong third quarter

5   earnings for 1998, attributing the two-digit earnings per share increase in part to

6   the "initial benefits from the worldwide restructuring program." App'x at 2198.

7   Xerox also reported that in connection with the WWR, 1,700 employees had left

8   the company during the third quarter, bringing the total number of positions

9   eliminated thus far to 3,200. The release reminded the public that

10  "[a]pproximately 9,000 jobs will be eliminated under the program, which is

11  designed to enhance the company's competitive position and further align its

12  cost structure with the demands of the digital world." App'x at 2199.

13       **A.    1998 Internal Communications About the CBO Reorganization**

14       As memorialized in Xerox's internal communications, the WWR, and also

15  the CBO Reorganization specifically, contemplated and caused significant

16  changes in staffing levels. To put it in Xerox's terms, "roughly 500 heads were

17  captured" as a result of the CBO Reorganization. App'x at 3584. These shifts in

18  staffing had effects on Xerox's operations throughout the United States.

8

1     By way of example, the accounting firm KPMG visited the Texas CAC on

2     October 26 and 27, 1998, and reported several issues with the CBC transition,

3     including that "[s]ales representatives are very unhappy with the lack of face to

4     face interaction with the CBRs." App'x at 5025. Challenges with staffing changes

5     and reductions, "due to the disruption created by the reduction in resources and

6     the restructuring transition changes," App'x at 2295, were further described in an

7     internal memorandum prepared by KPMG on the subject of billing quality dated

8     November 6, 1998.

9     The November 6, 1998 KPMG memorandum specifically described the

10     effects of the CBO Reorganization on bill processing, which included moving

11     eighty percent of Xerox's accounts to new support locations: "[c]oincident with

12     the closing and reorganization, . . . . very few tenured . . . order processing

13     administrators relocated to the new CBCs, and . . . experienced CAC/CBC

14     collection and billing administrators were re-assigned to order entry positions."

15     App'x at 2296. The result of all of these shifts was that aproximately twenty

16     percent of the billing support staff was comprised of completely new hires. The

17     memorandum projected further deterioration in billing and invoicing prior to

18     any significant improvements in those areas. App'x at 2295. In another internal

9

1    memorandum sent to the Operations Committee on the same day, accounts

2    receivable fund usage was described as "worse" than the prior year, with the

3    "deterioration . . . largely driven by the reorganization of the customer

4    administration centers in the U.S." App'x at 5032.

5    **B.      1999 Internal Communications About the CBO Reorganization**

6        In its internal communications throughout 1999, Xerox attempted to deal

7    with the CBO Reorganization and its effects on operations. In April 1999, the

8    president of the NASG, Thomas J. Dolan, submitted a memorandum to Romeril

9    on the subject of "Second Quarter/Second Half" in response to Romeril's request

10    for "key messages to the investment community." App'x at 705. Dolan noted that

11    the profit plan shortfall "was attributable to poor sale activity level, a sale gross

12    margin shortfall, weaker than expected Post Sale, and above plan Service/Admin

13    costs." App'x at 705. He also noted that "[w]e are currently addressing several

14    cost related issues including . . . Admin resource add-back and bad debt flow

15    through impact on our aging receivable." App'x at 706.

16        On July 1, 1999, an internal memorandum from Patrick J. Fulford, the vice

17    president of the NASG Finance, described a "[s]tate of [e]mergency" for the

18    NASG. App'x at 3376. This correspondence did not reference or identify the CBO

1    Reorganization specifically, although the attached chart revealed low sales

2    productivity and "Bad Debt." App'x at 3378. A July 22, 1999 internal presentation

3    on the CBO Reorganization noted the "massive backlog" related to aged accounts

4    receivable and billing errors, and noted that it was "[t]oo far too fast." App'x at

5    3397. A subsequent slide stated that "[w]e have a five alarm fire," and noted

6    "major impact on customers and sales productivity." App'x at 3398. The

7    presentation also cited problems with customer satisfaction; billing accuracy and

8    timeliness; as well as employees under "severe duress." App'x at 3398.

9        An internal memorandum dated July 26, 1999 sent from a newly hired

10    senior vice president of the NASG to CBO employees, acknowledged that there

11    were some "serious issues" with which to contend. The memorandum stated that

12    "we obviously have gone through a massive change in the last 12 months. We

13    took a significant reduction in resources and lost substantial experience and

14    tenure. . . . Senior management has acknowledged we went 'too far, too fast.'"

15    App'x at 3488.

16        In a document titled "CBO Background Summary" created for a meeting in

17    September 1999, the CBO Reorganization was described as having caused

18    problems at the service level "immediately." *Id.* at 3584. Specifically, it identified

11

1    Accounts Receivable ("A/R") and Days Sale Outstanding ("DSO") numbers as

2    having increased, which meant that Xerox was not collecting on its bills as

3    rapidly as it had in the past. *See Xerox*, 935 F. Supp. at 452-53. The "[r]oot

4    [c]auses" of the problems were described as "lack of resources, loss of skills, and

5    disruption," as well as the fact that Xerox had "lost hundreds of man-years of

6    experience when we redeployed the highly experienced [CBRs] into other

7    assignments . . . and hired many completely new people in the [CBCs]." App'x at

8    3584.

9        Later in 1999, Thoman and Romeril grappled with the effects of the CBO

10   Reorganization within the larger context of the WWR. For example, a September

11   27, 1999 internal memorandum from Thoman to operations committee members,

12   with the subject "Headcount Approval," warned that the company must be

13   better in "control of manpower" given the company's expenditures, and he noted

14   that "[a]s a result of our failure to strictly control resources, we have, in essence,

15   spent much of the benefit of the restructuring action." App'x at 3608. On October

16   6, 1999, Romeril sent Thoman an internal memorandum with talking points in

17   preparation for the phone-in meeting for preliminary 1999 third quarter results,

18   and at point (10) of the memorandum Romeril asked: "[w]hat happened to

12

1    restructuring benefits? If they were real, they must have been spent, delayed or

2    offset by deterioration elsewhere." App'x at 3612.

3    II.    <u>**Xerox's Public Disclosures During the Class Period: October 22, 1998**</u>
4    <u>**through October 7, 1999**</u>
5
6    While Xerox's officers were drafting internal memoranda, presentations,

7    and emails discussing how to fix the billing issues and the increased A/R and

8    DSO numbers as a result of the CBO Reorganization, Xerox was also issuing

9    public statements about how its WWR was progressing. We provide a small

10    representative portion of those statements in the following two subsections.

11    **A.    October – December 1998 Disclosures**

12    In Xerox's 1998 third quarter Form 10-Q filing with the SEC dated

13    November 10, 1998 Xerox stated that there were "higher accounts receivable due

14    to stronger equipment sales growth and some increase in days sales outstanding

15    due to the temporary effects from the reorganization and consolidation of U.S.

16    customer administrative centers." App'x at 2320.

17    Romeril, Xerox's CFO at the time, met with several different securities

18    analysts in November and December 1998. On November 20, 1998, in a meeting

19    with an analyst at Putnam Securities, contemporaneous notes taken by Leslie F.

13

1    Varon, Xerox's Controller, reflected that Romeril acknowledged that Xerox had

2    "not done well on inven and receiv mgt," but assured that "we're all over it," and

3    predicted that "[i]n '99, we'll go back to ratios we had in '97 & then move

4    forward from there." App'x at 334.  At a December 14, 1998 meeting with

5    Wellington Management, Romeril noted that there was a temporary disruption

6    with A/R "due to admin restruc.," but that it "[s]hould be fixed by end '99."

7    App'x at 337. At another December meeting, Romeril told a Merrill Lynch &

8    Company analyst that Xerox's "receivables" issue was attributed to its

9    consolidation of customer administration centers and changes in collection

10   processes in the United States.

11            Following this last meeting, a Merrill Lynch analyst report dated December

12   17, 1998 described "[r]evenue growth as [its] near-term concern." App'x at 970.

13   The report announced that Xerox planned to improve cash flow management,

14   and noted that operating cash flows had been negatively affected by increases in

15   receivables and inventories. Finally, the report noted that "[t]he company

16   estimates that it can reduce inventories by $300-400 million (no write-offs) and

17   improve DSOs through faster collections." App'x at 972.

1        **B.      January – October 1999 Disclosures**

2        At an earnings release teleconference for the fourth quarter of 1998, held on

3   January 26, 1999, Romeril announced earnings-per-share and income increases,

4   which he primarily attributed to "outstanding growth in digital product

5   revenues, improved operating margins, and the ongoing benefits from our

6   worldwide restructuring program." App'x at 762. He also noted that DSO had

7   increased because of the CBO Reorganization, stating that "[s]ome of the

8   restructuring that we did in the United States gave us a dislocation so that our

9   day sales outstanding went out a bit. And on a mechanistic basis alone, that gives

10  you a bit more in the bad debts." App'x at 781-82. At a meeting with a Morgan

11  Stanley Dean Witter analyst also held that day, Romeril commented that Xerox's

12  cost cutting measures and U.S. restructuring had been "[t]oo ambitious." App'x

13  at 347; *see also* App'x at 328. Romeril also mentioned that if he was right about the

14  "[r]eceiv[ables]," they "won't see US bad debts repeated." App'x at 347.

15       The following day, Morgan Stanley Dean Witter issued a report describing

16  this information to investors, noting that "we raise a cautionary eyebrow at

17  Xerox's working capital performance in 1998," and that "[w]hile full details have

18  yet to be disclosed, management stated that both inventory levels/turns and

15

receivables/Days Sales Outstanding proved disappointments in 1998." App'x at 977.

On February 25, 1999, Morgan Stanley Dean Witter released a "Preliminary Update on Year-End Balance Sheet and Cash Flow Items" stating:

> ACCOUNTS RECEIVABLE ALSO EXPANDED - Xerox's A/R balance increased 25% year-over-year, to $2.7 billion. The receivables ballooned as Xerox attempted to restructure several operations in the US. The reorganization and reorientation of business units (from geographical to customer focused) led to the disruption in billing cycle productivity. Once again, management remains committed to reducing receivable levels back to those found in 1997 by year-end 1999.

App'x at 1001.

In April 1999, the Center for Financial Research and Analysis ("CFRA") released a report detailing "[s]igns of possible operational deterioration for [Xerox] during 1998," and reporting that "[Xerox]'s receivables grew much faster than revenue during 1998." App'x at 1154. The report quantified comparative growth in receivables and DSOs from the fourth quarter of 1996 through 1998, and reported that Xerox "attributed the December-to-December DSO increase to temporary effects from the reorganization and consolidation of U.S. customer administrative centers." *Id.*

16

The next month, at an investor conference held on May 14, 1999, Romeril

stated that:

> 1998 cash generation was clearly unsatisfactory. And it was
> principally caused by a deterioration in receivables, in day sales
> outstanding and our inventory performance. The growth in [A/R]
> was primarily the result of the reorganization and restructuring in
> our US administrative support activities. We closed one customer
> admin center and we reorganized the remaining three admin centers
> from a geographic to a customer segment basis. Much along the lines
> of what we're doing for the business as a whole. And frankly, we
> reduced the headcount as we did that at too fast a rate. And it was
> too much change, too fast.

App'x at 1187-88. Later on at the same meeting, Romeril explained further:

> [W]e had, as we rolled out our G&A programs, individual areas
> where we caused some lack of focus on our sales force because of
> our G&A activities.  For example, we talked about our Chicago
> center [i.e., one of the three CBCs that remained post-CBO
> Reorganization]. Unquestionably that had some impact on our sales
> force.  They had to worry about the billing being done correctly.

App'x at 1201-02.

A subsequent PaineWebber research note dated June 7, 1999 stated that:

> It appears that Xerox's restructuring program in the US had quite an
> adverse effect on the company's receivables in 4Q 1998 and 1Q 1998
> [sic]. In the second half of 1998, [Xerox] reduced its US
> administrative centers to 3 from 4 previously, reducing
> administration headcount by 30% in the process. The 3
> administrative centers were reorganized to specialize on General
> Markets (channel, agent, concessionaire and tele-web sales), the

17

1      public sector and other (direct sales force included). As a result of
2      the significant disruption from moving and layoffs, the company's
3      order and invoicing processes experienced significant delays and
4      even errors, pushing up receivables. In fact, [Xerox] is now in the
5      process of re-hiring some laid off personnel in an effort to improve
6      the order process at the 3 new administration centers. Improvements
7      are already underway and Xerox expects significant improvement in
8      receivables by second half 1999.

10  App'x at 1337.

11      On August 13, 1999, Salomon Smith Barney reported that the A/R "figure

12  rose by 21% year-to-year and 5% sequentially from Q1." App'x at 1368. The

13  report also commented that:

14      While [this A/R news is] disappointing, this should not have come as
15      too much of a surprise, since management has indicated repeatedly
16      that receivables would start to come down more in the second half
17      than the first. The company is adding over 100 people back to its
18      [CACs], in part to help bolster collections efforts, which were
19      damaged by headcount reductions during the restructuring. This
20      will be an important issue to monitor for improvement in Q3 and
21      Q4.

23  *Id.*

24      In a September 22, 1999 announcement, Romeril acknowledged that "[i]t is

25  also very clear that we significantly underestimated the revenue impact in the

26  first quarter of this year of all the customer administration changes we made in

27  the USA last year." App'x at 1379. Then, on October 8, 1999, Xerox announced

1  that it would not make its third quarter earnings projections. Xerox's press

2  release provided, in pertinent part:

3      Xerox Corporation . . . announced today that it expects to report
4      essentially flat revenues for the third quarter and about a 10 - 12
5      percent decline in diluted earnings per share from 53 cents in the
6      1998 third quarter. Overall, revenue was weaker than anticipated
7      both in the United States and Europe, particularly in September. The
8      earnings shortfall is a combination of weaker revenues together with
9      unfavorable product mix and increased competitive pressures,
10     which significantly impacted operating margins. Sales productivity
11     was affected by the continued realignment to an industry-oriented
12     approach and in the U.S. by the ongoing impact of the customer
13     administration restructuring. In addition, results in Brazil were hurt
14     by the continuing effects of the currency devaluation and economic
15     weakness. Fuji Xerox results were lower than anticipated.
16
17     "Today's announcement is clearly disappointing," said Xerox
18     President and Chief Executive Officer Rick Thoman. "However, we
19     are convinced that our strategy of focusing on industry solutions, a
20     broader array of distribution channels and an expanding product
21     and services portfolio is correct and over time will achieve the
22     revenue and earnings benefits it is intended to produce."

23  App'x at 3615.

24      **C.    Public Disclosures About the 1999 Sales Force Realignment**

25          On January 6, 1999, Xerox had also announced another initiative, the 1999

26  SFR. The 1999 SFR focused on "realigning [Xerox's] document processing

27  business under four operations: Industry Solutions, General Markets, Developing

1    Markets, and Business Group Operations." App'x at 2513. The stated goal of the

2    1999 SFR was ultimately to realign the sales force territories from geography-

3    based selling to industry-based selling. The 1999 SFR was distinct from the WWR

4    or the CBO Reorganization, though there was some overlap in its focus on the

5    U.S. sales force.

6         Related to the 1999 SFR, on September 16, 1999, a Prudential Securities

7    analyst issued a report with a heading: "XEROX TO IMPLEMENT ANOTHER

8    ROUND OF SALESFORCE REALIGNMENTS IN 1Q00 - LOWERS REVENUE

9    VISIBILITY AND LIKELY TO PRESSURE [Xerox] UNTIL IMPACT CAN BE

10    DETERMINED." App'x at 3541. The report continued:

11         Our field contacts are indicating that Xerox is readying another
12         round of salesforce account realignment similar to the program
13         which disrupted the first half 1999 revenue performance. We
14         confronted Xerox's management and they acknowledged that
15         another round is planned for 1Q 2000 and indicated the number of
16         people involved and accounts involved would be larger than the 1Q
17         1999 realignment which was cited as a large portion of the cause for
18         the 1H 1999 revenue shortfall. Xerox's management must be
19         cognizant of the painful experience they had last year, and they are
20         indicating they are taking every possible step to minimize any
21         disruption from this move.
22
23    App'x at 3541-42. Later that same day, Reuters reported that shares of Xerox fell

24    more than ten percent "amid fresh growth concerns." App'x at 3545.

20

1        The Prudential Securities report was based on a misunderstanding that

2    there was a *new* realignment program, rather than a mere continuation of the

3    already-announced 1999 SFR. Romeril corrected this misunderstanding in a

4    subsequent announcement held on September 22, 1999: "there seems to have

5    been some misconception that we announced a new restructuring of the sales

6    organization, last week. No such announcement occurred. . . . In fact, we simply

7    took another step implementing the direction we announced last January [i.e., the

8    1999 SFR]." App'x at 3597-98.

9    **D.    Alleged Corrective Disclosures**

10        Plaintiffs' loss causation expert Professor Anthony Saunders opined that

11    there were two "corrective disclosures," which revealed the problems with the

12    CBO Reorganization to the market, each of which has been already described

13    above. First, Plaintiffs claim that the September 16, 1999 Prudential Securities

14    report describing Xerox as "readying another round of salesforce account

15    realignment," App'x at 3541, after which Xerox shares dropped, was a corrective

16    disclosure. Second, Plaintiffs point to the October 8, 1999 press release

17    announcing that Xerox would be missing its projected earnings for the third

18    quarter of 1999, and reporting that "[s]ales productivity was affected by the

1    continued realignment to an industry-oriented approach and in the U.S. by the

2    ongoing impact of the customer administration restructuring," App'x at 3615, as

3    having a corrective effect on Xerox's stock price.

4    **III.    Proceedings Before the District Court**

5         Plaintiffs filed suit in this case in 1999, alleging violations of Section 10(b)

6    of the Exchange Act and Rule 10b-5 and Section 20(a) of the Exchange Act against

7    the individual defendants. In 2001, the district court denied Xerox's motion to

8    dismiss. *See In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208 (D. Conn. 2001). The

9    court granted Plaintiffs' motion for class certification in 2008. Over the course of

10   2009 and 2010, the court ruled on multiple motions to exclude the testimony of

11   experts proffered by both sides. *See In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d

12   402 (D. Conn. 2010) ("*Saunders Ruling*"); *In re Xerox Corp. Sec. Litig.*, 821 F. Supp.

13   2d 504 (D. Conn. 2010) ("*Denis Ruling*"); *In re Xerox Corp. Sec. Litig.*, 2009 WL

14   8556135, Civil Action No. 3:99CV-02374 (AWT) (D. Conn. Apr. 22, 2009)

15   ("*Gompers Ruling*").

16        In March 2013, the district court granted Xerox's motion for summary

17   judgment in its entirety, holding that the statements about the overall

18   cost-savings of the WWR did not preclude the entry of summary judgment in

22

1    favor of Xerox. *Xerox*, 935 F. Supp. 2d at 482-83, 485. The court also held that

2    while Xerox had not met its burden of proving that it did not have a duty to

3    disclose that the CBO Reorganization offset some of the cost-savings of the

4    WWR, *id.* at 485-88, and even assuming that Xerox had a duty to disclose, there

5    was no genuine dispute that the company had sufficiently disclosed the

6    challenges that it was experiencing with the CBO Reorganization, *id.* at 488-93. As

7    to the corrective disclosures, the district court concluded that those two

8    disclosures did not add any new information to the market, and as a result,

9    Plaintiffs had not established a genuine dispute of material fact as to loss

10   causation. *Id.* at 493-96. Finally, in light of its conclusion that there was no

11   underlying violation of federal securities law, the court also granted summary

12   judgment on Plaintiffs' control person liability claim against the individual

13   defendants. *Id.* at 496.

14                                              **DISCUSSION**

15         On appeal, Plaintiffs contend that the district court erred in granting

16   summary judgment to Defendants because, viewing the record evidence in

17   Plaintiffs' favor: (1) Xerox misrepresented that the WWR resulted in financial

18   benefits to the corporation; (2) Xerox's public disclosures about the challenges

                                              23

1    resulting from the CBO Reorganization—including the increases in A/R and

2    DSOs—omitted the extent of the CBO Reorganization's ill-effects; (3) Xerox

3    falsely attributed its decreased sales activity to the 1999 SFR, rather than the CBO

4    Reorganization; and (4) the district court's September 2010 *Saunders Ruling*,

5    which found admissible Plaintiffs' witness Anthony Saunders's expert report on

6    loss causation, precluded the district court from granting summary judgment.

7    **I.    Applicable Legal Standards**

8        **A.    The Standard of Review**

9        We review a district court's grant of summary judgment de novo. *Lawrence*

10   *v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003). Summary judgment is only appropriate

11   "if the movant shows that there is no genuine dispute as to any material fact and

12   the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An

13   issue of fact is genuine "if the evidence is such that a reasonable jury could return

14   a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

15   248 (1986). "In looking at the record, we construe the evidence in the light most

16   favorable to the nonmoving party and draw all inferences and resolve all

17   ambiguities in favor of the nonmoving party." *In re Omnicom Grp., Inc. Sec. Litig.*,

18   597 F.3d 501, 509 (2d Cir. 2010) (brackets and internal quotation marks omitted).

1      **B.       Section 10(b) and Rule 10(b)-5**

2           Section 10(b) of the Exchange Act forbids "(1) the 'use or employ[ment] . . .

3      of any . . . deceptive device'; (2) 'in connection with the purchase or sale of any

4      security,' and (3) 'in contravention of' Securities and Exchange Commission

5      'rules and regulations.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005)

6      (quoting 15 U.S.C. § 78j(b)). Rule 10b–5 forbids the making of any "untrue

7      statement of a material fact" or the omission of any material fact "necessary in

8      order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5.; *see*

9      *also Dura Pharm*, 544 U.S. at 341.

10          A Rule 10(b)-5 action requires the following elements:

11          (1) a material misrepresentation (or omission);
12          (2) scienter, i.e., a wrongful state of mind;
13          (3) a connection with the purchase or sale of a security;
14          (4) reliance, often referred to in cases involving public securities
15          markets (fraud-on-the-market cases) as "transaction causation";
16          (5) economic loss; and
17          (6) "loss causation," i.e., a causal connection between the material
18          misrepresentation and the loss.
19
20      *Dura Pharm.*, 544 U.S. at 341-42 (citations and italics omitted).

21          To fulfill the materiality requirement, "there must be a substantial

22      likelihood that the disclosure of the omitted fact would have been viewed by the

25

1    reasonable investor as having significantly altered the total mix of information

2    made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal

3    quotation marks omitted). "[Section] 10(b) and Rule 10b-5(b) do not create an

4    affirmative duty to disclose any and all material information. . . . Even with

5    respect to information that a reasonable investor might consider material,

6    companies can control what they have to disclose under these provisions by

7    controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 131

8    S. Ct. 1309, 1321-22 (2011).

9    **II.    Analysis**

10    In essence, this case is about Plaintiffs' wish to have known more about

11    Xerox's WWR and CBO Reorganization. However, "a corporation is not required

12    to disclose a fact merely because a reasonable investor would very much like to

13    know that fact. Rather, an omission is actionable under the securities laws only

14    when the corporation is subject to a duty to disclose the omitted facts." *In re Time*

15    *Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *see also Matrixx Initiatives*, 131

16    S. Ct. at 1321 ("The question remains whether a *reasonable* investor would have

17    viewed the nondisclosed information as having *significantly* altered the total mix

18    of information made available. . . . [T]he mere existence of reports of adverse

26

1    events . . . will not satisfy this standard. Something more is needed . . . ." (internal

2    quotation marks omitted)).

3        In light of Xerox's public statements about its restructuring and

4    realignment initiatives, we conclude that there is no genuine dispute as to

5    whether a reasonable investor would have viewed the undisclosed facts about

6    the CBO Reorganization as having significantly altered the total mix of

7    information that was already disclosed by Xerox or otherwise available. Below,

8    we first address Plaintiffs' contention that Xerox's statements about the financial

9    benefits of the WWR to the corporation were actionably false. Next, we address

10    Plaintiffs' contention that, viewing the evidence in their favor, summary

11    judgment was improper because of the dispute regarding whether Xerox's partial

12    disclosures and overly tepid language describing the CBO Reorganization were

13    materially misleading. Finally, we address briefly Plaintiffs' remaining assertions

14    challenging the district court's conclusions on loss causation and the *Saunders*

15    *Ruling*.

A.    **There is No Genuine Dispute Regarding the Statements about the WWR**

In ruling on Xerox's motion for summary judgment, the district court considered both Plaintiffs' expert Charles R. Drott's report and Xerox's expense chart, prepared by NASG Finance Vice President Fulford, and concluded "that approximately $339.5 million in expense was incurred during the Class Period as a result of the CBO Reorganization." *Xerox*, 935 F. Supp. 2d at 482. After correcting for double counting across both documents, the court determined that the Drott report and Fulford chart showed a total expense of $295.5 million to Xerox. *Id.* at 482-83. Taking into account Xerox's $550 million in cost savings as a result of the WWR, the court decided that "Xerox had a net cost savings from the Worldwide Restructuring of at least $254.5 million." *Id.* at 483.

We conclude that the record on summary judgment creates no genuine dispute regarding the truthfulness of Xerox's statements about the overall benefits of the WWR. As an initial matter, Plaintiffs provide no public statements actually quantifying the amount of savings Xerox claimed resulted from the WWR, and contemporaneous records from Xerox show $124.6 million in savings in the fourth quarter of 1998; $128.9 million in the first quarter of 1999; $147.1

28

1    million in the second quarter of 1999; and $144.6 million in the third quarter of

2    1999. Plaintiffs do not dispute Xerox's claimed cost-savings figures, and they

3    acknowledge that the elimination of 9,000 jobs worldwide necessarily reduced

4    costs. At most, the record supports an inference that the additional costs created

5    by the CBO reorganization offset savings created by the restructuring as a whole.

6         Plaintiffs attempt to create a genuine factual dispute by quarreling with the

7    *extent* of the benefits accrued as a result of the WWR, rather than with the *fact* that

8    benefits did accrue, which is not an argument they raised below. We decline to

9    exercise our discretion to consider this argument for the first time on appeal.[1] *See*

10   *In re Nortel Networks Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008); *Allianz Ins. Co. v.*

11   *Lerner*, 416 F.3d 109, 114 (2d Cir. 2005); *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d

12   Cir. 1998).

---

[1] As a subpart of their newly raised argument, Plaintiffs point to the Drott report and Fulford chart, which both discuss the *same* CBO Reorganization-related issues. Each document cites billing errors, interest arising from insufficient cash flow (due to increased DSO), etc., as contributing to various costs, and there is significant overlap between the two. Plaintiffs offer no explanation for how the numbers in these documents should be analyzed so as to avoid double counting. Thus, this argument has not been adequately developed on appeal, and we will not attempt our own parsing of the Drott and Fulford documents.

29

1       Further, though Plaintiffs rely on two contemporaneous internal

2  documents to argue that there is a genuine dispute as to whether the stated

3  benefits of the WWR were illusory, these documents, even when viewed in the

4  light most favorable to Plaintiffs, do not reasonably permit the inference Plaintiffs

5  seek to draw. The first document, a September 27, 1999 internal memorandum

6  from Thoman to operations committee members, notes that "[a]s a result of our

7  failure to strictly control resources, we have, in essence, spent much of the benefit

8  of the restructuring action." App'x at 3608. Second, Plaintiffs point to an October

9  6, 1999 internal memorandum from Romeril to Thoman, prepared in advance of

10  the phone-in meeting for preliminary third quarter results for 1999. In particular,

11  Plaintiffs emphasize Romeril's question: "[w]hat happened to restructuring

12  benefits? If they were real, they must have been spent, delayed or offset by

13  deterioration elsewhere." App'x at 3612.

14       Since there is no reading of the actual numbers that supports these

15  statements, they are evidently exaggerations intended to inject urgency into the

16  company's efforts. More importantly, they would be misleading if publicly

17  disclosed as the company's assessment. Further, while these two internal

18  documents show that Xerox had significant costs to contend with, they also

30

1    reveal that there were undisputed benefits that had accrued from the WWR for

2    Xerox to put to use. Thus, these two documents do not support the reasonable

3    conclusion that Xerox made any misstatements as to the benefits of the WWR.

4         Plaintiffs also assert that these statements about the WWR's benefits were

5    merely "half-truths" that required a more thorough explanation to not be

6    deceptive. However, as discussed above, Plaintiffs did not actually show a

7    genuine dispute as to whether Xerox accrued financial benefits as a result of the

8    WWR. On this record, it would be conjecture to conclude that Xerox's statements

9    about the cost-savings of the WWR—without a subsequent reference to the costs

10   incurred as a result of the CBO Reorganization—were misleading.  *See Basic Inc.*,

11   485 U.S. at 239 n.17 ("To be actionable, of course, a statement must also be

12   misleading."). The record shows that there is no genuine dispute about whether

13   the statements regarding the WWR being a benefit to Xerox from a cost-saving

14   standpoint were misleading.

1    **B.    There is No Genuine Dispute Regarding the Sufficiency of the**
2          **Disclosures about the CBO Reorganization[2]**
3
4          Plaintiffs further assert that the district court improperly drew inferences

5    and resolved factual disputes in Xerox's favor when it determined that there

6    were no actionable misstatements or omissions with regard to: (1) Xerox's public

7    disclosures about the problems resulting from the CBO Reorganization and (2)

8    Xerox's attribution of sales force troubles to the 1999 SFR rather than to the CBO

9    Reorganization.

10

---

[2] Xerox asserts that in light of the fact that the WWR did result in cost-savings for the corporation, it was under no duty to disclose *any* information about the particulars of the CBO Reorganization. This argument goes too far. In the restructuring context, there may well be circumstances in which details about a single component of a larger restructuring initiative would be material to a reasonable investor in a way that would require disclosure of certain facts. We decline Xerox's invitation to make any sort of bright-line rule on this point.

Further, "the lack of an independent duty is not[] . . . a defense to Rule 10b-5 liability because upon choosing to speak, one must speak truthfully about material issues." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002). Thus, as the record clearly indicates that Xerox chose to speak, and actually spoke at great length, about its U.S.-based reorganization, it was under a duty to speak truthfully.

In any event, as discussed below, there were ample disclosures made about the CBO Reorganization. As such, we need not and do not address the question of whether Xerox had a duty to disclose any information about the CBO Reorganization in the first place.

1      For the reasons set forth in this section, we hold that there is no genuine

2  dispute as to whether the disclosures about the various challenges and obstacles

3  created as a result of the CBO Reorganization sufficiently informed a reasonable

4  investor about its ongoing effects during the class period.

5          1.      Claimed Omissions and Misstatements About the CBO
6                  Reorganization
7
8      Plaintiffs assert that the district court incorrectly decided that the

9  distinctions between Xerox's carefully phrased public disclosures (e.g., "some

10  increase" in DSO) as compared to the more colorful language in the corporation's

11  internal documents (e.g., "significant deterioration") were immaterial. Plaintiffs

12  also argue that Xerox failed to disclose material facts about the actual,

13  quantifiable impact the CBO Reorganization problems were having on

14  operations, sales, and earnings.

15      Plaintiffs contend that it was misleading for Xerox to have publicly

16  attributed an increase in A/R to stronger equipment sales, while privately

17  revealing that A/R increases were "largely driven" by the CBO Reorganization.

18  With regard to the public disclosures, Plaintiffs point specifically to Xerox's

19  November 10, 1998 third quarter submission to the SEC, which attributed an

1    increase in A/R to stronger equipment sales. The same document also stated that

2    the increase in DSOs was the result of the effects of reorganizing and

3    consolidating the U.S. CACs. Plaintiffs then emphasize that an internal

4    memorandum circulated on the same date stated that the increased A/R *and* DSO

5    were "largely driven by the reorganization of the [CACs] in the U.S." App'x at

6    5032.

7          Any assertion that Xerox attributed higher A/R *solely* to stronger

8    equipment sales is belied by the record evidence. Plaintiffs' argument fails to

9    account for the many subsequent disclosures, some of them in November and

10   December of 1998, that directly discuss the "bad debts" that accrued as a result of

11   increased A/R and DSOs. Thus, although Plaintiffs may have uncovered a

12   discrepancy in early November 1998, the myriad disclosures that followed state

13   the primary reasons for increases in A/R and DSOs. For example, in February

14   1999, Morgan Stanley Dean Witter reported on Xerox's year-end balance sheet

15   and noted that "[Xerox's] receivables ballooned as Xerox attempted to restructure

16   several operations in the US. The reorganization and reorientation of business

17   units (from geographical to customer focused) led to the disruption in billing

34

1    cycle productivity." App'x at 1001. Thus, any confusion on the cause of the

2    increased receivables and DSOs was cleared up within the relevant time period.

3        In addition, the CBO Reorganization's negative effects on Xerox's revenue

4    growth in general was discussed in Xerox's public disclosures. An April 1999

5    Merrill Lynch report describing Xerox's first quarter in 1999 stated that revenue

6    was "disappointing," and noted that "Xerox's revenue growth was hurt by sales

7    force and restructuring initiatives, a self-inflicted wound." App'x at 1945. The

8    CFRA report from that same month described "[s]igns of possible operational

9    deterioration," including an increase in DSO numbers, and stated that Xerox

10   attributed that increase to the CBO Reorganization. App'x at 1154. In May 1999,

11   Romeril admitted to investors that 1998 cash generation was "clearly

12   unsatisfactory," App'x at 1187, and he explained that this cash generation was

13       principally caused by a deterioration in receivables, in day sales
14       outstanding and our inventory performance. *The growth in accounts*
15       *receivable was primarily the result of the reorganization and restructuring*
16       *in our US administrative support activities. We closed one customer admin*
17       *center and we reorganized the remaining three admin centers from a*
18       *geographic to a customer segment basis.*
19
20   App'x at 1187-88 (emphasis added).

35

1        Each of these public disclosures, along with the others listed in the

2   background section above, leaves no doubt that it was disclosed that the

3   reorganization of the U.S. operations caused deterioration in A/Rs and DSOs. The

4   investing public had access to this information as early as November 1998, and

5   throughout the remainder of the class period, prior to either claimed corrective

6   disclosure date in September and October 1999. While Plaintiffs may have

7   desired more detailed or nuanced language, that is not what the law requires.

8   "Corporations are not required to phrase disclosures in pejorative terms." *In re*

9   *Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 392 (S.D.N.Y. 2010), *aff'd*

10  *sub nom. Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120 (2d Cir. 2011); *cf. In re*

11  *Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 375 (3d Cir. 1993)

12  ("[P]laintiffs cannot successfully contend that the prospectus is actionable

13  because it failed to describe its debt-equity ratio as either 'unwarranted' or

14  'excessive.'").

15        Though Plaintiffs seek to establish a factual dispute on the basis that an

16  investor would have wanted to know that Xerox internally referred to its sales

17  force and bill collection issues as a "five alarm fire," we have never required a

18  corporation to frame its public information with specific adjectives. "Disclosure is

36

1    not a rite of confession or exercise of common law pleading." *Wilson*, 671 F.3d at

2    131 (internal quotation marks omitted).  Rather, "[w]hat is required is the

3    disclosure of material objective factual matters." *Id.* (internal quotation marks

4    omitted). Indeed, "we have held that 'it would be as serious an infringement of

5    SEC regulations to overstate the definiteness of . . . plans as to understate them.'"

6    *Id.* (brackets omitted) (quoting *Elec. Specialty Co. v. Int'l Controls Corp.*, 409 F.2d

7    937, 948 (2d Cir. 1969)).

8          That Plaintiffs wish that *more* was said, perhaps in more evocative

9    language, is simply insufficient to establish a genuine dispute as to whether the

10   market was adequately informed about the impact of the CBO Reorganization on

11   Xerox during the class period. "The touchstone of the inquiry is not whether

12   isolated statements . . . were true, but whether defendants' representations or

13   omissions, considered together and in context, would affect the total mix of

14   information and thereby mislead a reasonable investor regarding the nature of

15   the securities offered." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir.

16   2002).

17         We hold that here, whether one referred to a problem as a "five alarm fire"

18   internally or as just causing a "deterioration" as the result of "too much change,

37

1    too fast" publicly, the bottom line was the same: the public information reflected

2    that the CBO Reorganization was causing problems for Xerox's bill collection and

3    sales force operations. On the significant factual record before us, no reasonable

4    juror could find, based on the disclosures made by Xerox over the course of the

5    class period, that material information was omitted or falsely reported. The

6    district court's conclusion on this point was correct.

7        2.    Claimed Misstatements Conflating the CBO Reorganization
8            and the 1999 SFR

9        For similar reasons, we also reject Plaintiffs' assertion that the district court

10    improperly resolved evidentiary issues in Xerox's favor with respect to the

11    relationship between the CBO Reorganization and its effect on Xerox's sales

12    force.  Plaintiffs argue that the evidence showed that the "true cause" of sales

13    disruptions was the CBO Reorganization and *not* the 1999 SFR, and that Xerox

14    falsely attributed its poor sales performance to the 1999 SFR.

15        In support of their argument, Plaintiffs point out that Thoman's script for

16    the May 1999 investor conference specifically mentioned "[t]oo much time fixing

17    customer problems because of our consolidation of admin centers," App'x at

18    2994, and that at the investor conference itself, Thoman decided not to say

38

1   anything about the problems with the "admin centers." *See* App'x at 3145-46. As

2   an initial matter, this is an inaccurate description of what Thoman actually said at

3   the investor conference. Thoman did discuss the CACs: "[f]or example, we talked

4   about our Chicago center" after having noted that there was a "lack of focus on

5   our sales force." App'x at 1202. That was a direct reference to the ongoing effects

6   of CBO Reorganization, given that the closure of one of the four CACs was a

7   main part of the CBO Reorganization initiative.

8       Further, the public was informed that Xerox was undergoing several

9   initiatives at the same time between late 1998 and October 1999: the Worldwide

10  *Restructuring*, the CBO *Reorganization*, and the Sales Force *Realignment*. For

11  example, on July 1, 1999, Prudential Securities reported that "Xerox cited a

12  laundry list of distractions which encumbered the sales force in 1Q. Many sales

13  offices were closed or moved *as a result of the restructuring*. Salespeople were

14  *distracted by too many training programs*." App'x at 1359 (emphasis added). This

15  report discussed the effects of both the CBO Reorganization and the 1999 SFR as

16  adding to Xerox's "laundry list of distractions."

17      The record in this case contains ample, undisputed evidence that the

18  problems plaguing Xerox's sales force were connected to the CBO Reorganization

39

1    and the added pile-on of the 1999 SFR, and that Xerox disclosed as much to the

2    investing public. The district court was correct to conclude that the information

3    about the negative impact that the CBO Reorganization had on Xerox's sales

4    force was disclosed to the market before either of the claimed corrective

5    disclosure dates.

6    **C.    Plaintiffs' Remaining Arguments on Appeal**

7         1.    Loss Causation

8         For the reasons discussed above, we conclude that the record evidence

9    does not support Plaintiffs' overarching theory of this case. This is because the

10    market had access to numerous disclosures about sales disruptions and

11    operational difficulties suffered as a result of the U.S. restructuring throughout

12    the class period. As a result, "none of these [claimed] matters even purported to

13    reveal some then-undisclosed fact with regard to the specific misrepresentations

14    alleged." *In re Omnicom Grp.*, 597 F.3d at 511; *see also id.* at 512 ("A negative

15    journalistic characterization of previously disclosed facts does not constitute a

16    corrective disclosure of anything but the journalists' opinions."); *Teacher's Ret.*

17    *Sys. of La. v. Hunter*, 477 F.3d 162, 187-88 (4th Cir. 2007) (noting that negative

18    characterization of previously known information cannot constitute a corrective

40

1    disclosure); *cf. In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 269-71 (3d Cir. 2005)

2    (finding elucidation of past disclosure by *The Wall Street Journal* did not constitute

3    a corrective disclosure). As we affirm the judgment of the district court on the

4    basis that there were sufficient disclosures made prior to either of the claimed

5    corrective disclosure dates, Plaintiffs' loss causation argument also fails.

6        2.    The Interaction Between the *Daubert* and Summary Judgment
7            Rulings
8
9    We also address briefly Plaintiffs' assertion that, having qualified Saunders

10   as an expert, summary judgment should not have been granted. Despite

11   Plaintiffs' protestations, the district court's *Saunders Ruling* is not contradicted by

12   its later summary judgment opinion.  Rather, the substance of the *Saunders Ruling*

13   was that the court: (1) accepted Saunders's proffered methodology, 746 F. Supp.

14   2d at 411-12; (2) concluded that "Prof. Saunders could show that the alleged

15   corrective disclosures contained new information that was material," *id.* at 412;

16   and (3) decided that Saunders relied on an "approach that is recognized in the

17   literature," *id.* at 413-14. Properly read in context, the district court's conclusion

18   that "Prof. Saunders *could* show that the alleged corrective disclosures contained

19   new information that was material," *id.* at 412 (emphasis added), was not a

41

1    decision that, as a matter of law or fact, Saunders had established anything at that

2    point in the litigation. Further, it is not clear that the district court was

3    considering the full summary judgment record when deciding the *Daubert*

4    motions.

5         "The court performs the same role at the summary judgment phase as at

6    trial; an expert's report is not a talisman against summary judgment." *Raskin v.*

7    *Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). While it is perhaps uncommon for the

8    court to have credited the expert's opinion in a *Daubert* ruling only to grant

9    summary judgment without any discussion of that expert's opinion, "summary

10   judgment is not *per se* precluded because there are conflicting experts." *In re*

11   *Omnicom Grp.*, 597 F.3d at 512. An expert may be entitled to his opinion, but he is

12   not entitled to a conclusion that his view of the facts necessarily precludes

13   summary judgment. Here, because we conclude that the information about the

14   CBO Reorganization's negative effects on operations and sales was known to the

15   market prior to September 16, 1999, Professor Saunders's opinion about the

16   corrective disclosures is, "as a matter of law, unsustainable on this record." *See id.*

17   at 513.

18

1                                    **CONCLUSION**

2            For the reasons discussed above, we affirm the district court's grant of

3    summary judgment in favor of Defendants.